02-09-272-CR












 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

NO. 02-09-00272-CR

 

 


 
 
 Jon Michael Layer
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 The State of Texas
 
 
  
 
 
 STATE
 
 


 

 

----------

 

FROM THE 89th
District Court OF Wichita COUNTY

----------

 

MEMORANDUM
OPINION[1]

----------

 

I. 
Introduction

         
In six issues, Appellant Jon Michael Layer appeals his conviction on four
counts of aggravated sexual assault of a child.  We affirm.

II. 
Factual and Procedural Background

         
Layer was accused of committing four counts of aggravated sexual assault of a
child.[2]  Layer pleaded not guilty, and a
jury found him guilty and assessed punishment at life imprisonment on each
count.  The trial court entered judgment on the verdict and ordered that
Layer’s sentences run consecutively.  This appeal followed.

III. 
Sufficiency of the Evidence

         
In his first, second, third, and fourth issues, Layer challenges the factual
sufficiency of the evidence to support his four-count conviction. 
However, the court of criminal appeals has held that there is no meaningful
distinction between the legal and factual sufficiency standards.  Brooks
v. State, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (overruling Clewis
v. State, 922 S.W.2d 126, 131–32 (Tex. Crim. App. 1996)).  Thus, the Jackson
standard, explained below, is the “only standard that a reviewing court should
apply in determining whether the evidence is sufficient to support each element
of a criminal offense that the State is required to prove beyond a reasonable
doubt.”  Id.

A. 
Standard of Review

         
In our due-process review of the sufficiency of the evidence to support a
conviction, we view all of the evidence in the light most favorable to the
prosecution to determine whether any rational trier of fact could have found
the essential elements of the crime beyond a reasonable doubt.  Jackson
v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Clayton v.
State, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

         
This standard gives full play to the responsibility of the trier of fact to
resolve conflicts in the testimony, to weigh the evidence, and to draw
reasonable inferences from basic facts to ultimate facts.  Jackson,
443 U.S. at 319, 99 S. Ct. at 2789; Clayton, 235 S.W.3d at 778. 
The trier of fact is the sole judge of the weight and credibility of the
evidence.  See Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979);
Brown v. State, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008), cert.
denied, 129 S. Ct. 2075 (2009).  Thus, when performing an evidentiary
sufficiency review, we may not re-evaluate the weight and credibility of the
evidence and substitute our judgment for that of the factfinder.  Williams
v. State, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).  Instead, we Adetermine
whether the necessary inferences are reasonable based upon the combined and
cumulative force of all the evidence when viewed in the light most favorable to
the verdict.@  Hooper v. State, 214
S.W.3d 9, 16–17 (Tex. Crim. App. 2007).  We must presume that the
factfinder resolved any conflicting inferences in favor of the prosecution and
defer to that resolution.  Jackson, 443 U.S. at 326, 99 S. Ct. at
2793; Clayton, 235 S.W.3d at 778.  We must consider all the
evidence admitted at trial, even improperly admitted evidence, when performing
a sufficiency review.  Clayton, 235 S.W.3d at 778; Moff v.
State, 131 S.W.3d 485, 489–90 (Tex. Crim. App. 2004).

B. 
Evidence

         
The Layer family moved from Bay St. Louis, Mississippi, to Keller, Texas,
because of Hurricane Katrina.  They then moved back to Mississippi for a
short time before relocating to Wichita Falls, Texas, in June 2007. 
Layer, his wife Mary, and their three children—B.L., T.L., and A.L.L.—shared a
house with Mary’s brother and his family.  The complainant,
thirteen-year-old A.L.L., shared a room with her fourteen-year-old sister T.L.
and five-year-old cousin H.O.

         
1.  A.L.L.’s May 28, 2008 Outcry 

         
On May 28, 2008, A.L.L. told her school counselor that Layer had molested her;
the counselor called Child Protective Services (CPS).  As school let out,
Wichita Falls Police Officer Alan Killingsworth met the CPS worker at A.L.L.’s
school, spoke with A.L.L., and decided to take A.L.L. to the child advocacy
center for a forensic interview.  Officer Killingsworth stated that as
they emerged from the school, A.L.L. and T.L. pointed out Layer to him in the
parking lot, but Layer drove away before the officer could speak with him.

         
At the child advocacy center, Deanee Moran conducted a forensic interview with
A.L.L.  Moran testified as A.L.L.’s outcry witness, stating that A.L.L.
told her the following:

·        A.L.L.’s father had
been sexually abusing her daily for a long time.

 

·        When A.L.L. was ten
years old and the family lived in a FEMA trailer in Mississippi, Layer tried to
put his penis in her private part and, on a different occasion, tried to put
his penis in her mouth.

 

·        In Wichita Falls in
early May 2008, A.L.L. asked Layer for permission to go to a park, and he
grabbed her and started “messing with her private part.”

 

·        In Wichita Falls in
April 2008—about a month before the interview—Layer stuck his hand down the
front of A.L.L.’s shorts and touched the inside of her private part.  On a
different occasion, he told her to sit on his bed, and then he unbuttoned her
pants and licked her private part.

 

·        When the family lived
in Keller, Mary saw Layer “messing with her”—Layer’s hand down her pants,
playing with her private part—and Mary asked a bunch of questions.

 

         
Moran had A.L.L. mark on an anatomically correct female diagram the portion of
the body A.L.L. referred to as her “private part,” which she designated as the
female sexual organ.

         
A.L.L. also told Moran that Layer had three or four vibrators in his room.
 A.L.L. described them and said that he had used two of them on her,
sometimes on the inside of her private part.  A.L.L. told Moran that Layer
would also use the vibrator on his penis and that Layer told her, with regard
to the vibrators, to be quiet and “don’t tell nobody” and if she did tell,
“that he would leave and never come back.”  After the forensic interview,
A.L.L. was taken to a teen shelter.

         
Officer Killingsworth watched A.L.L.’s forensic interview from the observation
room adjacent to the interview room.  After the forensic interview, he
obtained a search warrant and went to Layer’s house.  Layer was not
home.  Officer Killingsworth spoke with Mary and searched Mary and Layer’s
bedroom, which Layer kept locked, for evidence corroborating A.L.L.’s
statements.  He found the following items, photographs of which were
entered in evidence:  a massager vibrator, a pink dildo, a round rubber
object that appeared to be a sexual toy, and two pornographic DVDs entitled
“First Time Teens” and “Teenage Fantasies:  Anal Virgins.”[3]

         
After leaving Layer’s house, Officer Killingsworth went to Layer’s friend’s
nearby house to look for Layer, but to no avail.  On May 30, 2008—two days
after executing the search warrant—Officer Killingsworth spoke by phone with
Layer’s sister Pixie, who lived in Keller, and arranged for Layer to make a
statement at the Wichita Falls police department on June 2.

         
2.  A.L.L.’s May 29, 2008 Follow-up Interview

         
On May 29, 2008, Officer Killingsworth met with A.L.L. to clarify the details
regarding her statements in the forensic interview.  She told him that
Layer woke her on May 28 by penetrating her female sexual organ with his hand
and that this went on until Layer heard T.L. coming out of the bathroom.[4] 
She also said that Layer had done the same thing to her on May 27.  And
she described to him an incident that occurred the day the family went to Lucy
Park in Wichita Falls, when Layer put his hand down her shorts and her
underwear and, again, caused the digital penetration of her female sexual organ
and began moving his fingers around.  Officer Killingsworth’s interview
with Mary helped him narrow the date of the park visit to May 3, 2008.

         
A.L.L. also described an incident that occurred at the end of April 2008, on
the morning she was supposed to take part of the TAKS test.  Her father
woke her that morning by performing oral sex on her.  Layer had removed
her pants and her underwear and had his head under the covers and performed
oral sex on her until he heard one of her cousins leaving the adjacent bedroom.[5]

         
A.L.L. also told Officer Killingsworth about incidents in Keller, such as when
Layer tried to force her to perform oral sex on him by forcing her mouth open
and forcing her head towards him—she said that she refused and he “got mad and
wouldn’t talk to her for a week”—and one occasion when Mary walked in and
interrupted them when Layer had his hand down her pants.  And she told
Officer Killingsworth that on more than one occasion, Layer tried to stick his
penis in her female sexual organ when they lived in a FEMA trailer in
Mississippi.

         
3.  Layer’s June 2, 2008 Interview

         
Layer’s June 2 interview with Officer Killingsworth was admitted into evidence
and published to the jury.  Layer began the interview by admitting that he
was scared.  Layer stated that he thought he had been asked to come to the
police station because A.L.L. was “probably accusing [him] of something” and
that he had been “dealing with it for a couple of years.”  Layer repeated
several times over the course of the interview that he had been dealing with
this problem of A.L.L. making accusations about him for around two years. 
And he told Officer Killingsworth more than once that when the family lived in
Mississippi, he had talked with a few people, including a judge, about what to
do about A.L.L. accusing him of “messing with her.”  Layer stated that the
sexual abuse idea was originally A.L.L.’s cousin’s, who taught A.L.L. that
“little trick” because he was rough on A.L.L. about school.

         
Layer explained to Officer Killingsworth that A.L.L. had wanted to attend a
school dance.  Layer and Mary said A.L.L. could go as long as she did not
ask to do anything else that summer because money was tight.  When A.L.L.
could not get into the dance because she was failing two classes, Layer told
her that their agreement—that if he brought her to the dance she could not do
anything else that summer—would stand.  A.L.L. became angry and then made
this accusation, as she had done in Mississippi.  Layer told Officer
Killingsworth that Mary knew about the problem with A.L.L., as did others in
Mississippi, because it had been going on for years.[6]
 Layer also told Officer Killingsworth that the judge Layer had spoken
with would be sending a letter and stated, “It is not something that’s is [sic]
just made up . . .  It’s been going on for years.”  As Officer
Killingsworth continued to question him, Layer stated, “I’m not trying to sweep
nothing under the rug.  I’ve been deal with this probably like two years.”

         
Over the course of the interview, Layer mentioned jail several times.
 When Officer Killingsworth told him that he did not see any reason why
Layer could not get probation if he was remorseful, Layer asked, “Can you put
that in writing?” and asked Officer Killingsworth if a probation recommendation
would be in his report.  Layer also told the officer that five different
lawyers told him “that y’all are gonna lie to me to get me to admit to it and
y’all are just gonna throw me in jail and forget all about me.”  Then he
stated that his sister was actually the one who talked with a lawyer for him.

         
Layer told Officer Killingsworth that on May 28, he woke up the kids and took
them to school and that he usually had to drag A.L.L. out of bed.  And he
told the officer that he was telling the truth and that he was not “gonna admit
to anything because [he] didn’t do nothing.”  Layer explained that he left
the middle school when he saw Officer Killingsworth with his daughters because
“it’s not the first time she’s tried to say this to me.”

         
Officer Killingsworth testified that Layer never gave him the name of the
Mississippi judge and that he would have followed up if he had had that
information.  The warrant for Layer’s arrest was signed two days after his
interview with Officer Killingsworth, and Layer was arrested eight days after
the warrant issued, when he turned himself in.

         
During cross-examination, Officer Killingsworth admitted that he had no
fingerprints, DNA, or other scientific evidence, and that no sexual assault
exam was performed on A.L.L.  He also stated that A.L.L. had made a
recantation to the district attorney’s office and that it was not unheard of
for sexual abuse victims to recant their statements.

         
4.  A.L.L.’s Recantation

         
A.L.L. first read to the jury the note that she wrote during her May 28, 2008
forensic interview: 

I love my mom and my
family and I really don’t want to leave them.  I don’t want my dad to
leave.  He will though—he will though because I told on him.  He’s
probably mad at me.  He said that if I told he would pack his stuff and
leave.  I don’t want that, so I keep it a secret.  All my life I kept
it a secret.  I just couldn’t hold it anymore.  I am really
sorry.  I’m tired to hold this—I’m tired to hold his secret.  I can’t
hold that kind of secret.

 

         
A.L.L. said that after her outcry, her mother was mad at first, that T.L. and
her brother were upset and mad, that this had torn her family apart, and that
she was placed in a children’s home for three weeks.  A.L.L. then read to
the jury her recantation letter dated September 29, 2008:

The truth has to come
out and my dad did not do it to me.  I only said that because I did not
want to be grounded for the summer, for going to the dance in which I did not
go to.  I wanted to go to camp because we—I wanted to go to camp because
we didn’t have time to, but I went anyway.

 

         
At trial, A.L.L. explained that she was not telling the truth when she wrote
the recantation and that she was mad when she wrote it because she had been
telling the truth before.  She was unhappy when she wrote the recantation
because Layer was in jail and her life had changed.  She admitted that she
had lied when she told Mary, her brother, and T.L. that Layer did not touch
her.  On redirect, A.L.L. stated that she was telling the truth at trial.

         
Mary took the September 2008 recantation letter, copied it, and took A.L.L. to
see Layer’s lawyer.  Mary stated that she had taken A.L.L. to see Layer’s
defense attorney because she was trying to make A.L.L. happy.  She said
that A.L.L. had wanted to know “what would have to be done in order for her
dad—for her recantation to work,” and they talked about an affidavit of
nonprosecution, which Layer wanted Mary to get A.L.L. to sign.  Mary
testified that A.L.L. had talked about recanting at the beginning of August
2008, then had written out a letter recanting her outcry, discussed it with
Mary, and dated it.

         
Mary stated that she did not believe A.L.L.’s recantation and that she thought
A.L.L. had signed it because “[s]he [didn’t] want her daddy in jail and she
[didn’t] want to feel like she’s responsible for that and she loves him and she
wants him free, but she [didn’t] want him home.”  Mary testified during
cross-examination that A.L.L. “has been known to be very untruthful” but then
contradicted herself on redirect by admitting that during her grand jury
testimony she had stated that A.L.L. had good character for truthfulness.
 A.L.L. stated that after recanting, she “was told that if [she] didn’t
tell the truth [she] was going to be put in jail,” that someone had told Mary
this, and that Mary had told her.[7]

         
Julie Porter, a counselor, testified that she had met with A.L.L. from June 19,
2008, to April 2, 2009.  In their first counseling session, A.L.L. told
her that she felt sad and guilty about her father being in jail.  In the
next session, A.L.L. expressed worry about what was happening to Layer and said
she missed him and felt to blame for him being in jail.  A.L.L.’s feeling
guilty was a recurring theme during her counseling sessions.  In one of
the earlier sessions, A.L.L. also told Porter that the abuse had gone on for as
long as she remembered and that she had told a friend at school because she
“just couldn’t keep it in anymore.”

         
At their August 14, 2008 session, Mary and T.L. brought A.L.L. to counseling,
and A.L.L. seemed withdrawn; Mary told Porter that A.L.L. knew Mary had upcoming
testimony before a grand jury.  At the session on September 11, 2008,
A.L.L. said that her brother had told her it was her fault that Layer was in
jail and that T.L. was not speaking to her.

         
At the session on September 25, 2008, A.L.L. seemed happier and said she was
getting along better with her siblings.  After the October 9, 2008
session, Porter learned from Mary that A.L.L. had recanted.  At the
October 23, 2008 session, A.L.L. seemed reluctant to discuss the recantation
letter and said that she did not remember what the letter said.  At their
November 6, 2008 session, A.L.L. expressed anger at the court for not allowing
her to visit her father, and at the November 20, 2008 session, A.L.L. indicated
that she was getting more support from her family after recanting.  Porter
stated, with regard to A.L.L.’s recantation, “I think [A.L.L.] felt under
family pressure.  I think she felt guilty and to blame for her dad to be
in jail.”

         
5.  A.L.L.’s Testimony about Abuse

         
A.L.L. testified that she was in preschool the first time Layer touched her
inappropriately.  They were in the car, and he touched her private area
with his hand.  He then did it every day, and he told her that if she told
anyone about it, he would leave and never come back.  She never spoke out
because he “was going to get mad at [her] if [she] did” and because he said he
would hurt her if she told.

         
A.L.L. testified that when they lived in Mississippi, Layer did not do anything
more than touch her private area, but she also testified that when they lived
in a trailer park in Mississippi, Layer tried to penetrate her anus with his
penis.  She did not remember how old she was when this occurred, but she
stated that she was elementary school-age and that it hurt.  Layer also
touched her private area with vibrators.  She never told anyone in
Mississippi about the sexual abuse.

         
When they moved to Keller, he continued to touch her inappropriately “inside of
the crack” of her private area when no one else was around.  Layer would
touch her “maybe about three times a day” every day.

         
When the family moved to Wichita Falls, Layer continued to touch her. Layer
came into the girls’ bedroom in the morning and “st[u]ck his hand down [her]
pants.”  A.L.L. pretended to be asleep because she did not want to wake
her cousin.  She denied that Layer ever tried to perform oral sex on her
in Wichita Falls but stated that he had tried unsuccessfully when they lived in
the Mississippi trailer park.  A.L.L. also testified that Layer called her
into the computer room and told her to watch dirty videos with him.

         
A.L.L. stated that she had told the truth to her school counselor and Moran. On
cross-examination, A.L.L. stated that although she once said that she had told
T.L. and Mary about the abuse, this was a lie, as was an occasion she had
described as Mary screaming when she saw Layer appear to be sexually abusing
A.L.L.

         
A.L.L. testified that Layer had touched her inappropriately in April 2008 before
she took the TAKS test, on the day she outcried, and most mornings when he came
to wake her, and she stated that he had touched her inappropriately on the
inside of the crack of her private part with his fingers more than five times
while they lived in Wichita Falls.  But she also stated that nothing had
occurred on the day she wanted to go to Lucy Park, that Layer had never tried
to have sex with her when they lived in Wichita Falls, and that Layer had never
tried to perform oral sex on her when they lived in Wichita Falls.

         
6.  Dr. William Carter’s Testimony

         
Dr. William Lee Carter, Ed.D., a psychologist, testified that it was not
unusual for a perpetrator to pick one child and leave the other child alone and
that the type and severity of abuse would tend to escalate as the molestation
continued and the child told no one.  He stated that, based on A.L.L.’s
testimony, this is what he thought happened, stating,

She spoke about how
when—when she was first touched, she was simply touched while in the car. 
She then went on to speak of how he would do other things, such as trying to
have sex with her, apparently trying to have oral sex, eventually as she gets
older, bringing her in and showing her pornography, all of those things in my
mind suggest an increase or an escalation in the sexual abuse events.

 

Dr.
Carter testified that showing A.L.L. pornography could be a form of grooming
behavior, “setting her up for something worse as she got older.”  He also stated
that most sexual abuse victims delay their outcries to some degree and that
anxiety can create minor somatic discomfort, such as a stomachache, when a
child is victimized.  And Dr. Carter testified that a big reason that
sexual abuse victims make recantations is because of the guilt, shame, and
blame following making an outcry.  On cross-examination, he admitted that
a recantation could also be consistent with a child that has not been sexually
abused.

         
7.  Mary Layer’s Testimony

         
 Mary testified that Layer usually took the children to school and picked
them up afterwards because her driver’s license was expired.  On May 28,
Layer went to retrieve A.L.L. and T.L. but came home without them or his car,
looking upset.  He did not tell Mary why he did not bring A.L.L. and T.L.
home from school.  Instead, he told Mary that she would have to go pick
them up from school, even though he knew she did not have a valid driver’s
license.  He told her that he had parked the suburban at a grocery store
two blocks away, telling her that he left it there because it was low on gas.
 Mary said that this did not make any sense to her.

         
Mary went to the school and found T.L.  T.L. gave her a paper from CPS
that stated that CPS had A.L.L. and that listed a phone number for her to call.
When Mary found out from CPS about A.L.L.’s allegations against Layer, she felt
sick.  CPS removed not only A.L.L. but also T.L., and Mary was not happy
about either removal.

         
Later that afternoon, when Mary returned home, she learned Layer was at a
friend’s house nearby and that he was sick with chest pains.  She told him
that CPS had removed the girls and about A.L.L.’s allegations.  Layer told
her that he had not done anything wrong.  That evening, Officer
Killingsworth came to her house to execute a search warrant.  The next
day, Layer called her and told her that he was innocent, that he had had a
stroke, and that he was in Keller with his sister.  She stated that Layer
knew the police wanted to ask him some questions.

         
Mary stated that A.L.L. had always been a “daddy’s girl,” and she stated more
than once that she could not think of any reason why A.L.L. would make up
allegations of sexual molestation against her father.  Mary also said that
the reasons A.L.L. gave in her recantation did not make sense to her.

         
Mary said that to her knowledge there had never been problems in the past of
A.L.L. making false accusations against Layer or Layer taking his concerns
about such accusations to friends and a judge in Mississippi.  Mary also
said that, other than Layer’s personal knowledge, Layer would have no idea when
he drove up to the school on May 28 why the detective was there with his
daughters because A.L.L. had never made any allegations prior to May 28.
 Before May 28, she had asked both of her girls on several occasions
whether their father had been “messing with” them, and A.L.L. had always
previously said no.  Mary noted that A.L.L. had endured frequent
stomachaches since she was a child, and after the molestation allegations came
out, she thought it was possible that stress from the molestation had caused
them. 

         
Mary described an incident in Keller when A.L.L. was ten years old and she saw
Layer and A.L.L. on the sofa.  From where she was standing, it looked like
Layer was fondling A.L.L.  She stated that she walked up to the sofa and
confronted the situation.  Layer and A.L.L. told her that they were not
doing anything, and once she saw their positions clearly, she could tell that
she had been wrong.  The prosecutor then brought out her May 28 statement
to Officer Killingsworth with regard to her response to the officer’s question
about if she knew of any inappropriate behavior or activity and quoted her
response about the Keller incident:

To me it looked like
he was fondling her.  I couldn’t get an accurate answer from no one. . .
.  So I just [told] both of them how inappropriate that looked and how
inappropriate it was and him knowing that I came from the background that I came
from . . . .  He knows that I would not accept it.

 

Mary
excused the differences by saying that she was really “out there” on May 28 and
that she had now had time to remember.

         
Mary testified that she believed that Layer sexually assaulted A.L.L., but she
also admitted that she has stayed in constant contact with Layer and that she
would always love him.  She stated that loving Layer was engrained in
her—she was fifteen when she met him and they had been married for seventeen
years—but that it did not mean anything and that she did not have the money for
a divorce.  She admitted that she talked with Layer about A.L.L.’s filing
an affidavit of nonprosecution but stated that she also told A.L.L. not to sign
one.

         
8.  A.L.L.’s Name

         
Officer Killingsworth testified that he had learned that A.L.L.’s first name
and middle name were the same as the first and last name of a pornographic film
star who, between 1993 and 2004, had starred in almost 200 films.  Mary
testified that she decided on A.L.L.’s first and middle names and that she
found out only after naming A.L.L. that A.L.L. shared the same name as a porn
star.

         
Kitten Hotard, Layer’s second cousin and a former crack addict, testified that
she had visited the Layers at the end of 1999 and beginning of 2000.  One
afternoon during the visit, she, Layer, Mary, and another guy sat around in the
living room, drinking beer and talking about how people had gotten their names.
 The Layers’ son was named after an uncle, and T.L. was named after
Layer’s mother.  And then Layer said that A.L.L. was named after a porn
star and that “her name altogether was [A.L.L.] so that one day he could lay
her.”

         
9.  K.S.A.T.’s Testimony

         
The State’s final witness, K.S.A.T., testified that she was six years old on
February 12, 1986.  Her mother dropped her off at the babysitter’s house.
 The babysitter’s boyfriend—who was a white male in his late teens or
early twenties—was there.  When the babysitter went upstairs, the
boyfriend called K.S.A.T. over to the sofa and put his hand down her pants.
 The babysitter came downstairs and saw this happen.  K.S.A.T. ran
from the house as her mother’s car pulled up, and she told her mother what had
happened.  The police interviewed her, and she learned that the
babysitter’s boyfriend’s name was Jon Layer.  After K.S.A.T.’s testimony,
Layer stipulated that he was the man identified by K.S.A.T.

C. 
Analysis

         
All four counts of the indictment alleged that Layer’s acts occurred in Wichita
County.  The first three counts alleged that Layer had penetrated the
female sexual organ of A.L.L., a child younger than fourteen years, with his
finger on or about May 3, 27, and 28, 2008, and the fourth count alleged that he
had caused A.L.L.’s sexual organ to contact his mouth on or about April 30,
2008. See Tex. Penal Code Ann. § 22.021(a)(1)(B)(i), (iii) (Vernon
2010).

         
In his first issue, Layer argues that the fundamental issue before this court
is what to make of A.L.L.’s recantation and conflicting testimony about when
and how Layer molested her.  Layer argues that based on A.L.L.’s
recantation and testimony, the evidence is too weak to support his conviction
and that this court should not “embrace the jury’s a la carte approach to
[A.L.L.’s] testimony—putting it on the tray when her testimony supports a
conviction and putting it back on the tray when it doesn’t.”[8]

         
We initially observe that the State is not required to prove the specific date
the offense occurred when the indictment alleges an “on or about” date and that
the evidence is sufficient if it proves the offense occurred on a date anterior
to the presentment of the indictment but within the statutory limitation period. 
Sledge v. State, 953 S.W.2d 253, 255–56 (Tex. Crim. App. 1997). 
Additionally, a child complainant’s testimony, standing alone, can be
sufficient to support an aggravated sexual assault conviction.  Tex. Code
Crim. Proc. Ann. art. 38.07(a), (b)(1) (Vernon 2005); Garcia v. State,
563 S.W.2d 925, 928 (Tex. Crim. App. [Panel Op.] 1978); see also Bazanes v.
State, 310 S.W.3d 32, 40 (Tex. App.—Fort Worth 2010, pet. ref’d) (citing Garcia).
 And a child victim’s outcry statement alone can be sufficient to support
a conviction for aggravated sexual assault.  Tear v. State, 74
S.W.3d 555, 560 (Tex. App.—Dallas 2002, pet. ref’d), cert. denied, 538
U.S. 963 (2003); see also Kimberlin v. State, 877 S.W.2d 828, 831–32
(Tex. App.—Fort Worth 1994, pet. ref’d) (citing Rodriguez v. State, 819
S.W.2d 871, 873 (Tex. Crim. App. 1991)).

         
The record reflects that the Layer family moved to Wichita Falls in June 2007.
 The record also reflects that, after the morning of May 28, 2008, Layer
no longer had the opportunity to touch A.L.L.  A.L.L. testified that while
the family lived in Wichita Falls, Layer had touched her inappropriately more
than five times on the inside of the crack of her private part with his
fingers.  Moran, the outcry witness, testified that A.L.L. told her that
around a month prior to her forensic interview, Layer had licked her private
part.  And on Moran’s anatomically correct female diagram, A.L.L. circled
the female sexual organ as what she meant by “private part.”  Viewed in
the light most favorable to the prosecution, we conclude that the jury could
have found that Layer committed three counts of penetration of A.L.L.’s female
sexual organ with his finger and one count of causing A.L.L.’s sexual organ to
contact his mouth.[9]  See
Klein v. State, 273 S.W.3d 297, 298–99, 302–03 (Tex. Crim. App. 2008)
(holding, despite child’s recantation and lack of specific dates, that the
evidence was legally sufficient that the sexual assaults occurred “on at least
four separate occasions” when testimony established that during a specific time
period of four to six weeks, appellant touched the child’s sexual organ with
his fingers and tongue “most nights”); Chambers v. State, 805 S.W.2d
459, 461 (Tex. Crim. App. 1991) (“The jury observed the complainant’s demeanor
and was entitled not only to reconcile any such conflicts [in her testimony],
but even to disbelieve her recantation.”).

         
Although there may have been some conflicts in the evidence, they were for the
jury to resolve, and we may not re-evaluate the weight and credibility of the
evidence or substitute our judgment for that of the factfinder.  See
Tex. Code Crim. Proc. Ann. art. 38.04; Brown, 270 S.W.3d at 564; Williams,
235 S.W.3d at 750; see also Bell v. State, 693 S.W.2d 434, 443 (Tex.
Crim. App. 1985) (“[T]he jury, as the sole trier of fact, was entitled to
believe all or part of the conflicting testimony proffered and introduced by
either side.”).  We hold that the evidence is legally sufficient to support
Layer’s conviction on all four counts, and we overrule Layer’s first
issue.  And because we conclude that the evidence is legally sufficient to
support Layer’s conviction on all four counts, we overrule his second, third,
and fourth issues as well.

IV. 
Testimony

         
In his fifth issue, Layer argues that the trial court abused its discretion by
allowing K.S.A.T. to testify about sexual contact between them when she was a
child during the trial’s guilt-innocence phase.  Our court of criminal
appeals has stated:

Our case law supports
a decision that a defense opening statement . . . opens the door
to the admission of extraneous-offense evidence . . . to rebut the defensive
theory presented in the defense opening statement.  See Powell v. State,
63 S.W.3d 435, 438–40 (Tex. Crim. App. 2001) (in prosecution for indecency with
a child, defendant’s opening statement that he lacked opportunity to molest the
complainant under the circumstances of the charged offense opened the door to
admission of extraneous-offense evidence that defendant molested others under
almost identical circumstances to rebut defendant’s lack of opportunity
defensive theory); see also Daggett v. State, 187 S.W.3d 444, 453–54
(Tex. Crim. App. 2005) (in prosecution for sexual assault of [a] child under
seventeen, defendant’s sweeping direct-examination testimony disavowing any
sexual misconduct with minors opened the door to admission of
extraneous-offense evidence of defendant’s sexual misconduct with another minor
to rebut this sweeping testimony).

 

Bass
v. State, 270 S.W.3d 557, 563 (Tex. Crim. App. 2008).  The
issue does not necessarily turn on the type of defense presented but on whether
the extraneous-offense evidence has noncharacter-conformity relevance by, for example,
rebutting a defensive theory or making less probable defensive evidence that
undermines an elemental fact.  Id. at 563 n.8 (citing Powell,
63 S.W.3d at 438).  In Bass, the court held that the trial court
did not abuse its discretion when it admitted extraneous-offense evidence to
rebut the appellant’s defensive theory, introduced in his opening statement,
that the complainant had fabricated her allegations against him.  Id.
at 557, 563.

         
Layer claims that Powell and its progeny do not apply because K.S.A.T.’s
testimony “was not given to rebut a small parade of witnesses favorable to”
him.  However, during his opening statement, Layer addressed the jury as
follows:

Now, the question
that you’re going to have at the end of the day, I believe, is that we’re going
to conclude that there is a victim in this case.  The question is, who is
it? Is it the little girl or is it the little girl’s father?

 

I believe that the
evidence that we’re going to hear is that the little girl has got a reputation that
perhaps may not be everything that it should be for truth, honesty, fair
dealing.  I believe that we’re going to hear from the girl’s mother’s
mouth that she—that the little girl has a history of not telling the truth.

 

. . . . 

 

[A]t the end of the
day, the question that you’re going to have to address is:  Did [Layer] do
what the little girl [said] or is she making it up?

 

Defense
counsel then listed everything that he thought the State would fail to bring,
such as DNA evidence and fingerprints, before reiterating his theme that A.L.L.
was a liar and that Layer was her victim.

         
Layer raised fabrication by A.L.L. as his theory during his opening statement,
opening the door to the admission of K.S.A.T.’s testimony by the State to rebut
this theory, in addition to rebutting testimony brought out on
cross-examination with regard to A.L.L. telling the truth.  See id. 
Therefore, we conclude that the trial court did not abuse its discretion by
admitting this testimony during the trial’s guilt-innocence phase, and we
overrule Layer’s fifth issue.

V. 
Consecutive Sentences

         
In his sixth issue, Layer argues that the trial court abused its discretion by
ruling that his sentences were to be served consecutively because, under the
circumstances presented here, a cumulative sentence “has the practical effect
of working an injustice on [him]” when A.L.L. had failed to recall the abuse on
May 27 or the abuse related to the “park” incident during her testimony.

         
We review a trial court’s decision to cumulate sentences for an abuse of
discretion.  Strahan v. State, 306 S.W.3d 342, 351 (Tex. App.—Fort
Worth 2010, pet. ref’d).  A trial court may cumulate sentences for
aggravated sexual assault “committed against a victim younger than 17 years of
age at the time of the [offense’s commission,] regardless of whether the
accused is convicted of violations of the same section more than once or is
convicted of violations of more than one section.”  Tex. Penal Code Ann.
§ 3.03(b)(2)(A) (Vernon 2009).  Notwithstanding Layer’s complaint
about A.L.L.’s testimony above, we cannot say on the record presented here—as
recounted extensively above—that the trial court abused its discretion by
cumulating his sentences.  We overrule Layer’s sixth issue.

VI. 
Conclusion

         
Having overruled all of Layer’s issues, we affirm the trial court’s judgment.

 

 

PER CURIAM

 

PANEL: 
MCCOY, J.; LIVINGSTON, C.J.; and DAUPHINOT, J.

 

DO
NOT PUBLISH

Tex.
R. App. P. 47.2(b)

 

DELIVERED:  April 7,
2011

 

 














[1]See
Tex. R. App. P. 47.4.





[2]We
will address the evidence in greater detail below because Layer challenges its
sufficiency. 





[3]The
cover of the “Teenage Fantasies:  Anal Virgins” DVD advertises “Watch As
These Teens Take It Up The Ass For The First Time Ever!,” and “Young Girls
& Hardcore Ass Fucking!,” along with supporting photographic depictions.





[4]The
girls’ morning routine was for T.L. to get up first and go into the
bathroom.  A.L.L. told Officer Killingsworth that Layer would come into
the bedroom while T.L. was in the bathroom.





[5]Officer
Killingsworth stated that, in his training and experience, having closed out
372 crimes-against-children cases in three years in Wichita Falls, it was not
uncommon for a perpetrator to sexually abuse a child with other people in the
house or even in the same room.





[6]Layer
stated, “If they’re not telling you what’s been going on for two years[,] I’ll
have a judge with a document stating that it’s been going on because I’ve
talked to him about it.”





[7]Mary
testified that one of the district attorneys had told her about the consequences
of false statements under oath and that A.L.L. had overheard Mary talking with
her brother on the phone about it.





[8]In
his second, third, and fourth issues, Layer makes similar complaints,
contending that A.L.L.’s counselor’s testimony is not sufficient to support his
conviction for the May 27 count; that A.L.L.’s testimony that nothing happened
in the “park episode” leaves the evidence insufficient to convict him on the
May 3 count; and that A.L.L.’s testimony that Layer never tried to perform oral
sex on her in Wichita County renders the evidence insufficient to convict him
of the April 30 count.





[9]Additional
evidence supporting the jury’s conviction on all four counts included Layer’s
flight from the middle school and failure to return to Wichita Falls for over a
week after he saw Officer Killingsworth with his daughters, see Clay v.
State, 240 S.W.3d 895, 905 n.11 (Tex. Crim. App. 2007) (“Evidence of flight
evinces a consciousness of guilt.”); Layer’s interview, in which he claimed
that Mary and a judge knew about A.L.L.’s making allegations and that the judge
would be sending a letter about it, as compared to Mary’s testimony that May 28
was the first time A.L.L. had made an allegation of abuse, and the conspicuous
absence of any letter from a judge; the sexual toys recovered from Layer’s
bedroom that corroborated A.L.L.’s forensic interview statements; K.S.A.T.’s
testimony about how Layer molested her when she was six years old by putting
his hand down her pants while the babysitter was upstairs; and Layer’s cousin’s
disturbing testimony about how Layer had chosen A.L.L.’s name.